## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Dec 04 2019, 9:05 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Glen E. Koch II
Martinsville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

I.F. (Minor Child)

and

K.F. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

December 4, 2019

Court of Appeals Case No.
19A-JT-1774

Appeal from the Morgan Circuit Court

The Honorable Matthew G. Hanson, Judge

Trial Court Cause No.
55C01-1901-JT-40

**Altice, Judge.**

## Case Summary

K.F. (Mother) appeals from the involuntary termination of her parental rights to I.F. (Child). On appeal, Mother argues that the court's termination order is not supported by sufficient evidence.

We affirm.

## Facts & Procedural History

Mother and J.W. (Father)[1] are the biological parents of Child, who was born in June 2017. At the time of Child's birth, the Department of Child Services (DCS) was already involved with Mother and Child's older sibling, A.F., who had been determined to be a child in need of services (CHINS) and was living in an out-of-home placement. Child was not detained at birth because Mother was drug-free and, at that time, engaging in services as ordered by the case plan in A.F.'s CHINS action. By the end of August 2017, Mother had become noncompliant with services, cancelling and/or falling asleep during visits with A.F., and missing appointments with service providers.

When service providers visited Mother's home, they learned that several different men resided there, one of whom DCS had substantiated for child molestation and another (Dan Everroad) had pending felony charges for

---

[1] The court also terminated Father's parental rights to Child. Father, however, does not participate in this appeal. We will therefore set forth the facts as they relate to the court's termination of Mother's parental rights.

possession of illegal drugs and had recently been released from jail. Mother informed service providers that Everroad was her babysitter. Due to growing concerns for Child's well-being, on August 31, 2017, DCS went to Mother's home to conduct a welfare check but Mother and Child were not there. DCS contacted law enforcement, who arrived and confiscated marijuana from the front porch.

[5] On September 18, 2017, DCS filed a CHINS petition alleging that Child was a CHINS. Child, however, was not removed from Mother's care at that time. FCM Whitney Ksenak was assigned to Child's case from October 2017 until February 2018. FCM Ksenak noted that Mother was compliant with services from October through November 2017 in that she regularly engaged in therapy and life skills, submitted negative drug screens, obtained employment, and secured housing. As a result, FCM Ksenak petitioned for A.F. to be placed with Mother for a trial home visit, which request was granted.

[6] Starting at the end of December 2017 and into January 2018, Mother stopped responding to FCM Ksenak. "Every time" FCM Ksenak visited Mother's home, it would take several text messages and/or phone calls for Mother to answer the door. *Transcript* at 18. When Mother would let her in the home, FCM Ksenak learned that Child was not there as Mother allowed her to "go to inappropriate or unapproved individuals." *Id*.

[7] At approximately 1:30 p.m. on February 1, 2018, Mother left Child and A.F. in the care of Everroad. Later that afternoon, paramedics were called to Mother's

home on a report of an "unresponsive" child. *Exhibit Index* at 28. A.F. was pronounced dead at 3:55 p.m.[2] The following day, DCS filed a request to remove Child from Mother's care, which was granted. DCS also filed an amended CHINS petition regarding Child, alleging that placement with Mother was "no longer sufficient to maintain the safety of [C]hild". *Id*. at 26.

[8] At a detention hearing on February 5, 2018, Mother appeared with counsel and the court adjudicated Child a CHINS upon Mother's admission that she "recently left [C]hild in care of unapproved caregivers, that she has an ongoing CHINS case, and that [C]hild is a CHINS." *Id*. at 32. At a March 22, 2018 dispositional hearing, the court ordered Mother, among other things, to contact the FCM at least weekly; not use illegal drugs and submit to random drug screens; complete a substance abuse evaluation and follow all recommendations; maintain suitable, safe, and stable housing; obtain a stable source of income; and participate in visitation with Child.

[9] Lillian Tucker, a family support specialist and recovery coach with Centerstone, supervised Mother's visits with Child and worked with Mother on parenting and independent living skills from February 2018 through June 2018. During that timeframe, Mother attended sixty percent of her scheduled sessions—she cancelled four sessions and was a no-show thirteen times. Mother's progress was minimal, and she failed to maintain the progress she did attain. For

---

[2] According to the court's termination order, Everroad rolled over onto A.F. while Everroad was sleeping. Mother does not challenge this finding.

example, Tucker had to repeatedly model parenting behaviors because Mother continued to struggle with parenting. Tucker stopped working with Mother because Mother stopped attending sessions.

[10] FCM Jaime Casida took over the case as Mother's permanency case manager in June 2018. FCM Casida noted DCS's concerns with Mother included that she had an "on again off again problem with drugs." *Transcript* at 51. DCS worked with Mother on continued sobriety, stability, and parenting by providing her with substance abuse counseling, recovery coaching, life skills, individual and group therapy, visitation, and domestic violence services (at Mother's request). Mother, however, did not maintain contact with DCS or service providers—"More often than not [Mother] was MIA from everyone." *Id*. at 57. Eventually, Mother's referrals for services were closed out due to non-compliance. DCS subsequently learned that on August 1, 2018, Mother was arrested and incarcerated for drug possession.

[11] While Mother was incarcerated, Rebecca Lovely was assigned to provide her with therapy and counseling services. Mother's therapeutic goals included stabilization of both her mental health needs and substance abuse issues. While in jail, Mother attended most of her sessions with Lovely. Upon Mother's release, however, she did not contact Lovely or her FCM. Lovely testified that Mother did not achieve her goals. In March 2019, Mother switched providers because she moved to Indianapolis, but Mother failed to follow through.

[12] Mother submitted negative drug screens from January 2017 through January 2019. Thereafter, however, Mother refused to be screened. She eventually complied and submitted to drug screens, testing positive for amphetamine and methamphetamine on March 8, April 23, and May 1, 2019. She also tested positive for THC on May 1. During a team meeting on March 8, 2019, Mother admitted she had been using methamphetamine "for a while" and "she didn't really think that she would be able to stop using." *Id*. at 55. Mother also recognized that "she wasn't and isn't an appropriate caregiver for [Child]." *Id*. at 56.

[13] Marva Pesel, a family consultant with Lifeline Youth and Family Services, was Mother's parenting skills and visitation provider from March 2019 through May 2019. She scheduled two sessions a week with Mother, but when that did not work for Mother, she adjusted the sessions to once a week, which "really didn't happen either." *Id*. at 27. Out of eighteen possible sessions, Mother was a no-show or failed to schedule a session six times. When Mother did meet with Pesel, Mother would not accept Pesel's guidance or corrections regarding her parenting skills because she did not believe she needed help with parenting. Pesel testified that "there was no real bond" between Mother and Child. *Id*. at 29.

[14] Court Appointed Special Advocate (CASA) Lisa Dunn was assigned to Mother's case in October 2017 and continued in such capacity throughout the CHINS and TPR proceedings. CASA Dunn described Mother's participation in services as "very inconsistent." *Id*. at 45. She testified that Mother never

completed any services and that at the time of the termination factfinding hearing, Mother was not participating in any services despite having been re-referred for services in March 2019. CASA Dunn had the opportunity to observe visits between Mother and Child and noted that Child was "compliant," "well-mannered," and "pleasant" when around Mother but that Child "does not want to engage with her" and "doesn't have any emotional connection with [Mother]." *Id.* at 44. CASA Dunn recommended termination of Mother's parental rights because Mother:

- failed to consistently participate in services that were "continually provided and available to her"
- failed to continually make "any efforts towards recovery or rehabilitation" and "[did] not follow through with any plans"
- failed to follow through with a plan to achieve success and progress that was implemented while she was incarcerated
- "just refuses or is unable to follow thru [sic] with any plan that applies for her"

*Id.* at 45-46. CASA Dunn testified that Mother "continues to make poor choices that adversely affect her life and would obviously be neglectful for a young child to be a part of. She's not able to provide housing, she has no transportation, she is very intermittent with jobs, and unable to secure any stability in her life." *Id.* at 46. CASA Dunn did not believe that Mother could be the sober caregiver that Child needs.

[15] At a July 5, 2018 review hearing, the court found that Mother, who failed to appear, had not complied with the case plan, had not visited Child, and had not cooperated with DCS. The court noted that Mother had sporadically

participated in services, but recently had stopped participating altogether. The court set a permanency hearing for October 25, 2018, following which, the court found that Mother, who was incarcerated, had not complied with the case plan. The court approved concurrent plans of reunification and adoption.

[16] On January 22, 2019, DCS filed a petition for involuntary termination of Mother's parental rights. Mother appeared at an initial hearing on January 30, 2019, and a subsequent initial hearing on February 7, 2019, at which she denied the allegations in the termination petition. At a May 9, 2019 review hearing, the court found that Mother was "very inconsistent in services and visits" and had been "screening positive for illegal substances including meth and THC." *Exhibit Index* at 48.

[17] A termination fact-finding hearing was held on April 11 and July 2, 2019. Mother appeared for the April 11 hearing, but failed to appear for the July 2 hearing. On July 6, 2019, the court entered its order terminating Mother's parental rights to Child. Mother now appeals. Additional facts will be provided as necessary.

## Discussion & Decision

[18] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016). Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. In deference to the trial court's unique position to assess the

evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*. In light of the applicable clear and convincing evidence standard, we review to determine whether the evidence clearly and convincingly supports the findings and whether the findings clearly and convincingly support the judgment. *In re R.S.*, 56 N.E.3d at 628.

[19] The trial court entered findings in its order terminating Mother's parental rights. When the trial court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id.*

[20] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In*

*re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.*

[21] Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, that one of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B); Ind. Code § 31-37-14-2. Among other things, DCS must also allege and prove by clear and convincing evidence that termination is in the best interests of the child. I.C. § 31-35-2-4(b)(2)(C); I.C. § 31-37-14-2.

[22] Mother does not challenge any of the court's findings of fact. Thus, the issue before us is whether the unchallenged findings support the court's judgment. *In re S.S.*, 120 N.E.3d 605, 611 (Ind. Ct. App. 2019) (noting that "because neither Father nor Mother has challenged these findings on appeal, we must accept these findings as true") (citing *Bester*, 839 N.E.2d at 147).

[23] Mother challenges the court's findings as to subsection (b)(2)(B)(i) and (ii). We note that DCS was required to establish only one of the requirements of subsection (b)(2)(B) by clear and convincing evidence before the trial court could terminate parental rights. *See In re L.V.N.*, 799 N.E.2d 63, 69 (Ind. Ct. App. 2003). Here, the trial court found that DCS presented clear and convincing evidence that there is a reasonable probability the conditions resulting in the Child's removal or continued placement outside Mother's care will not be remedied and that continuation of the parent-child relationship poses a threat to Child's well-being. *See* I.C. § 31-35-2-1(b)(2)(B)(i), (ii). We focus our inquiry on the requirements of subsection (b)(2)(B)(i).

[24] In determining whether there is a reasonable probability that a parent will not remedy the conditions resulting in a child's removal from home, a trial court engages in a two-step inquiry. First, the court must "ascertain what conditions led to [the child's] placement and retention in foster care." *In re K.T.K.*, 989 N.E.2d 1225, 1231 (Ind. 2013). After identifying the initial conditions that led to removal, the court must determine whether a reasonable probability exists that the conditions justifying a child's continued "placement outside the home will not be remedied." *Id*. The court need not focus only on the initial reasons for removal but may also consider "those bases resulting in continued placement outside the home." *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*.

[25] As to the reasons for Child's removal, the trial court made the following unchallenged findings:

161) In this case, the [C]hild was not initially removed while [M]other had an open and pending CHINS case regarding an older child.

162) That the CHINS case on the other child began when it was alleged that [M]other did not have stability and was using drugs.

163) That this [C]hild was able to remain with [M]other at the time the CHINS case was initially filed as [M]other was once more minimally compliant and the DCS determined it would be best for [Child] to remain with [M]other.

164) That [M]other was compliant at times in the other CHINS case but as 2017 ended, it was apparent [M]other's compliance was waning, she was not showing stability and she was leaving the children with unapproved caregivers that [sic] presented a danger.

165) That this CHINS petition was filed in early 2018 but once more [Child] remained in the home in hopes that [M]other would once more slip back into compliance.

166) That after the February 2, 2018 hearing regarding the other child, [M]other returned home to find the other child was deceased.

167) That [M]other left both children with an unapproved caregiver that was using drugs and the caregiver rolled over and essentially suffocated the other child.

168) That after the CHINS petition was amended to include more information on the caregiver situation, [M]other admitted that [C]hild was a CHINS.

*Appellant's Appendix Vol. 2* at 26. Mother's prior CHINS case with Child's older sibling involved Mother's substance abuse. Likewise, Mother's substance abuse, as well as her stability and the fact that she left her children with unapproved caregivers, served as the basis for removal of Child from Mother's care. Contrary to Mother's argument, her sobriety was a concern at the beginning of the CHINS action.

[26] Mother argues that the court's conclusion that there is a reasonable probability that the conditions resulting in Child's removal or the reasons for placement outside the home will not be remedied is clearly erroneous. In making this determination, the trial court must judge a parent's fitness to care for her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *Id.* In making this determination, courts may consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. The court may also consider the parent's response to the services offered through DCS. *Lang v. Starke Cnty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*.

[27] The trial court made the following unchallenged findings regarding Child's continued placement outside Mother's care:

170)  That immediately following the admission [that Child was a CHINS] [M]other became compliant and this continued into the start of the summer of 2018.

171)  In June 2018 [M]other again began to be non-compliant.

172)  That [M]other essentially no-showed visits, no-showed appointments for intakes and disappeared.

173)  That after a few weeks it was determined that [M]other had relapsed on drugs and was in jail for new criminal offense.

174)  That during her time in jail [M]other was compliant with services, made great strides in showing a true desire to form a plan for when she was released, and wanted to do everything she could to get her child back once released.

175)  That upon release, [M]other told no one, did not follow the plan, but enrolled in another program of her choice.

176)  That [M]other was released from that program, again disappeared and again began to fail drug screens and/or simply not show up to services and visits.

* * *

179)  That [M]other, to this day continues to fail drug tests when she can be found, did not even show up for her hearing on this matter and oddly called the court multiple times on the day before and the day of the hearing insisting she was "on her way".

180)  That as far as DCS knows [M]other currently has no job, has no home that is stable and consistent, is using drugs and has

not been in contact with any of her services providers for visits with [C]hild.

\* \* \*

186) The exact same dangers that were present for [C]hild when the CHINS case began still exist today.

*Appellant's Appendix Vol. 2* at 26-27.

[28] The court's unchallenged findings support its conclusion that there is a reasonable probability that the conditions resulting in Child's removal and continued placement outside Mother's care will not be remedied. While Mother participated in services for a time, she made minimal progress that she failed to maintain. Over a period of two years, Mother never completed services and was unsuccessfully discharged by providers. Even after DCS re-referred services for Mother in the months prior to the termination hearing, Mother refused to participate. At the time of the termination hearing, Mother was not participating in any services. In fact, Mother did not even appear for the final fact-finding hearing.

[29] Further, while Mother was seemingly drug-free for a period of time, at the time of the termination hearing, Mother was testing positive for methamphetamine and marijuana. Moreover, Mother admitted that she had been using drugs and that she did not know if she would be able to stop. Mother's substance abuse was always a concern for DCS.

As we have stated before, "[a] pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, will support a finding that there exists no reasonable probability that the conditions will change." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). Mother's pattern of conduct shows no overall progress. The court's conclusion that there is a reasonable probability that the reasons for Child's removal and continued placement outside Mother's care will not remedied is not clearly erroneous.

Mother also argues that the court's conclusion that termination is in Child's best interests is clearly erroneous. To determine what is in a child's best interests, the court must look to the totality of the evidence. *In re A.D.S.*, 987 N.E.2d 1150, 1158 (Ind. Ct. App. 2013), *trans. denied*. The court must subordinate the interest of the parent to those of the child and need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Our Supreme Court has explained that "[p]ermanency is a central consideration in determining the best interests of a child." *In re G.Y.*, 904 N.E.2d 1257, 1265 (Ind. 2009). "Moreover, we have previously held that the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009).

[32] Here, both the FCM and CASA opined that termination was in Child's best interests. Indeed, FCM Casida recommended termination because Mother had not addressed her substance abuse or mental health issues, she continued to use drugs, and she had no bond with the Child. CASA Dunn, who was assigned to Child throughout the pendency of the CHINS and termination proceedings, believed Mother had made no sustained progress with her substance abuse issues or stability. Dunn testified that Mother continues to make poor choices that adversely affect her life and that would undoubtedly have a negative impact on Child. Dunn did not believe that Mother could be the stable, sober caregiver that Child needed. The recommendations of the FCM and CASA, coupled with the court's conclusion that the conditions resulting in removal are not likely to be remedied by Mother, lead us to the decision that the court's conclusion that termination is in the best interests of the Child is not clearly erroneous. We further note that Child is thriving in her pre-adoptive foster home and that DCS's plan is for Child to be adopted by her foster family. Dunn testified that since Child's placement with her foster family, she "has turned into the child that she truly deserves to be." *Transcript* at 47. The trial court's termination of Mother's parental rights is affirmed.

[33] Judgment affirmed.

Robb, J. and Bradford, J, concur.